## LEM MOON SING *v.* UNITED STATES.

### APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF CALIFORNIA.

No. 946.　Argued April 18, 19, 1895. — Decided May 27, 1895.

The power of Congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that respect enforced exclusively through executive officers without judicial intervention, having been settled by previous adjudications, it is now decided that a statute passed in execution of that power is applicable to an alien who has acquired a commercial domicil within the United States, but who, having voluntarily left the country, although for a temporary purpose, claims the right under some law or treaty to reënter it.

*Lau Ow Bew* v. *United States,* 144 U. S. 47, distinguished from this case.

No opinion is expressed upon the question whether, under the facts stated in the application for the writ of *habeas corpus,* Lem Moon Sing was entitled, of right, under some law or treaty to reënter the United States.

The case is stated in the opinion.

*Mr. Maxwell Evarts* for appellant.

*Mr. Assistant Attorney General Dickinson* for appellees.

Mr. Justice Harlan delivered the opinion of the court.

Lim Lung, on behalf of the appellant, Lem Moon Sing, presented to the District Court of the United States for the Northern District of California an application in writing for a writ of *habeas corpus,* directed to one D. D. Stubbs, and to the collector of the port of San Francisco, requiring them to produce the body of the appellant and abide by such order as the court might make in the premises.

The grounds set forth in the application for the writ were substantially as follows:

The appellant was a person of the Chinese race, born in China, and never naturalized in the United States.

At and before the passage of the general appropriation act of Congress, approved August 18, 1894, he was a Chinese merchant having a permanent domicil in the United States at San Francisco and lawfully engaged in that city in mercantile pursuits, and not otherwise. That domicil had never been surrendered or renounced by him.

On the 30th day of January, 1894, while conducting his business as a merchant at San Francisco, being a member of the firm of Kee Sang Tong & Co., wholesale and retail druggists in that city, he went on a temporary visit to his native land, with the intention of returning and of continuing his residence in the United States, in the prosecution of that business. He was so engaged for more than two years before his departure for China, and during that time performed no manual labor except as was necessary in the conduct of his business as a druggist.

During his temporary absence in China the appropriation act of August 18, 1894, was passed. That act contained these provisions:

"*Enforcement of the Chinese Exclusion Act:* To prevent unlawful entry of Chinese into the United States, by the appointment of suitable officers to enforce the laws in relation thereto, and for expenses of returning to China all Chinese persons found to be unlawfully in the United States, including the cost of imprisonment and actual expense of conveyance of

Chinese persons to the frontier or seaboard for deportation, and for enforcing the provisions of the act approved May fifth, eighteen hundred and ninety-two, entitled ' An act to prohibit the coming of Chinese persons into the United States,' fifty thousand dollars.

" In every case where an alien is excluded from admission into the United States under any law or treaty now existing or hereafter made, the decision of the appropriate immigration or custom officers, if adverse to the admission of such alien, shall be final, unless reversed on appeal to the Secretary of the Treasury." Act of August 18, 1894, c. 301, 28 Stat. 390.

The appellant returned to the United States, November 3, 1894, on the steamer Belgic, belonging to the Occidental and Oriental Steamship Company, of which D. D. Stubbs was secretary and manager. Upon his arrival here he applied to John H. Wise, collector of customs at San Francisco, to be permitted to land and enter the United States on the ground that he was formerly engaged in this country as a merchant. He submitted to the collector the testimony of two credible witnesses other than Chinese, showing that he conducted business as a merchant here for one year previous to his departure, as above stated, from the United States, and that during that period he was not engaged in the performance of any manual labor except such as was necessary in conducting his business as a merchant. His application to enter the United States was denied, and consequently he was detained, confined, and restrained of his liberty by Stubbs as secretary and manager of the steamship company.

In addition to the above facts, the application for the writ of *habeas corpus* alleged that Lem Moon Sing had not been apprehended and was not detained by virtue of the judgment, order, decree, or other judicial process of any court, or under any writ or warrant, but under the authority alleged to have been given to the collector of the port of San Francisco by the above act of August 18, 1894; that Lem Moon Sing was not at the date of the passage of that act nor for more than one year prior to the date of his departure for China for temporary purposes, and is not now, an alien excluded from

admission into the United States under any law or treaty now existing; and that said D. D. Stubbs and said John H. Wise, collector of the port, are without jurisdiction to restrain the said Lem Moon Sing of his liberty.

The petitioner also alleged that if Lem Moon Sing should not be allowed to enter the United States and to resume his residence and mercantile business therein, and be sent back to China, he would sustain great and irreparable loss, and his business be wholly destroyed, whereby he would be denied "that equal right granted to him by the Constitution and the laws of the United States, and by the treaties made and existing between the United States and the Chinese Empire, of which he is a subject."

It was further alleged that the detention and restraint of the liberty of Lem Moon Sing were without jurisdiction, void, and unconstitutional, and "without due process of law and against his rights under the Constitution and the laws of the United States and the treaties made between the United States of America and the Chinese Empire, and wrongfully and unlawfully under and by color of the authority of the United States asserted and exercised by the said John H. Wise, collector of the port of San Francisco."

The writ of *habeas corpus* was denied by the court below because in its judgment the application on its face showed that Lem Moon Sing was detained and restrained of his liberty by the collector of the port of San Francisco, under the act of Congress approved August 18, 1894, and consequently that jurisdiction over the petitioner was with the collector of the port of San Francisco. From this judgment an appeal has been prosecuted to this court.

The present case is, in principle, covered by the former adjudications of this court.

In the *Chinese Exclusion Case*, 130 U. S. 581, 603, this court said: "That the government of the United States, through the action of the legislative department, can exclude aliens from its territory, is a proposition which we do not think open to controversy. Jurisdiction over its own territory to that extent is an incident of every independent nation. It is a part of

its independence.   If it could not exclude aliens it would be
to that extent subject to the control of another power."   That
case involved the validity of the act of Congress of October 1,
1888, c. 1064, 25 Stat. 504, making it unlawful, from or after
that date, for any Chinese laborer who had theretofore been,
or was then or might become, a resident within the United
States, *and* had departed, or should depart from this country
before the passage of that act, "to return to, or remain in,
the United States."   The same act annulled all certificates
of identity issued under the previous act of May 6, 1882, c.
120, 22 Stat. 58.

The case of *Nishimura Ekiu* v. *United States,* 142 U. S.
651, 653, 659, 660, arose under the act of March 3, 1891, c.
551, 26 Stat. 1084, excluding from admission into the United
States, in accordance with acts then in force regulating immi-
gration, (other than those concerning Chinese laborers,) all
idiots, insane persons, paupers or persons likely to become a
public charge, persons suffering from a loathsome or a danger-
ous contagious disease ; persons who had been convicted of a
felony or other infamous crime or misdemeanor involving
moral turpitude, etc.   That act made provision for the ap-
pointment, by the President, by and with the advice and con-
sent of the Senate, of a superintendent of immigration, who
should be an officer of the Treasury, and to whom was com-
mitted, under the control and supervision of the Secretary
of the Treasury, the execution of the act.   It was further
declared by that act that "all decisions made by the inspec-
tion officers or their assistants touching the right of any alien to
land, when adverse to such right, shall be final, unless appeal
be taken to the superintendent of immigration, whose action
shall be subject to review by the Secretary of the Treasury."

Nishimura Ekiu, a female subject of the Emperor of Japan,
was denied the right to land in the United States, and was
held in custody to be sent back to her country, as the statute
required in such cases.   She sued out a writ of *habeas corpus.*
The Circuit Court of the United States confirmed the action
of the inspection officer and remanded the petitioner to his
custody.

This court, observing that, according to the accepted maxims of international law, every sovereign nation has the power, inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe, said : " In the United States this power is vested in the national government to which the Constitution has committed the entire control of international relations, in peace as well as in war. It belongs to the political department of the government, and may be exercised either through treaties made by the President and Senate, or through statutes enacted by Congress, upon whom the Constitution has conferred power to regulate commerce with foreign nations, including the entrance of ships, the importation of goods, and the bringing of persons into the ports of the United States ; to establish a uniform rule of naturalization ; to declare war, and to provide and maintain armies and navies ; and to make all laws which may be necessary and proper for carrying into effect these powers and all other powers vested by the Constitution in the government of the United States or in any department or officer thereof." " The supervision of the admission of aliens into the United States may be entrusted by Congress either to the Department of State, having the general management of foreign relations, or to the Department of the Treasury, charged with the enforcement of the laws regulating foreign commerce ; and Congress has often passed acts forbidding the immigration of particular classes of foreigners, and has committed the execution of these acts to the Secretary of the Treasury, to collectors of customs, and to inspectors acting under their authority." Again : " An alien immigrant, prevented from landing by any such officer claiming authority to do so under an act of Congress, and thereby restrained of his liberty, is doubtless entitled to a writ of *habeas corpus* to ascertain whether the restraint is lawful." It was further said that Congress could, if it saw fit, as in the statutes in question in *United States* v. *Jung Ah Lung*, 114 U. S. 621, authorize the courts to investigate and ascertain the facts on which the right to land

depends. "But, on the other hand," the court proceeded, "the final determination of those facts may be entrusted by Congress to executive officers; and in such a case, as in all others, in which a statute gives a discretionary power to an officer, to be exercised by him upon his own opinion of certain facts, he is made the sole and exclusive judge of the existence of those facts, and no other tribunal, unless expressly authorized by law to do so, is at liberty to reëxamine or controvert the sufficiency of the evidence on which he acted " — citing *Martin* v. *Mott*, 12 Wheat. 19, 31; *Philadelphia & Trenton Railroad* v. *Stimpson*, 14 Pet. 448, 458; *Benson* v. *McMahon*, 127 U. S. 457; *In re Oteiza*, 136 U. S. 330. The judgment was that the act of 1891 was constitutional; that the inspector of immigration was duly appointed; that his decision was within the authority conferred upon him by that act; and as no appeal was taken to the superintendent of immigration, that decision against the petitioner's right to land in the United States was final and conclusive.

These questions were again elaborately examined in *Fong Yue Ting* v. *United States*, 149 U. S. 698, 713, 714, which arose under the act of May 5, 1892, c. 60, 27 Stat. 25, prohibiting the coming of Chinese persons into the United States. Those were cases of Chinese laborers arrested and held by the marshal of the United States under that act, the sixth section of which made it the duty of all Chinese laborers, within the limits of the United States at the time of the passage of the act, and who were entitled to remain in the United States, to apply to the collector of internal revenue of their respective districts, within one year after that time, for a certificate of residence; and any Chinese laborer, within the limits of the United States, who should neglect, fail, or refuse to comply with the provisions of that act, or who, after one year from its passage, should be found within the jurisdiction of the United States without such certificate of residence, should be deemed and adjudged to be unlawfully within the United States, and subject to be arrested by any United States customs official, collector of internal revenue or his deputies, United States marshal or his deputies, and taken before a

United States judge, whose duty it was to order his deportation from the United States, unless he established clearly, to the satisfaction of the judge, that by reason of accident, sickness, or other unavoidable cause he had been unable to secure his certificate, and to the satisfaction of the court, and by at least one credible white witness, that he was a resident of the United States at the time of the passage of the act; further, that if, upon the hearing it should appear that he was so entitled to a certificate, it should be granted, upon his paying the cost. If it appeared that the Chinaman had secured a certificate that had been lost or destroyed, he was to be detained and judgment suspended a reasonable time to enable him to procure a duplicate from the officer granting it. Any Chinese person, other than a Chinese laborer, having a right to be and remain in the United States, and desiring such certificate as evidence of such right, could apply for and receive the same without charge.

The petitioners having assailed the validity of that section, this court said : "In *Nishimura Ekiu's case*, it was adjudged that, although Congress might, if it saw fit, authorize the courts to investigate and ascertain the facts upon which the alien's right to land was made by the statutes to depend, yet Congress might intrust the final determination of those facts to an executive officer, and that, if it did so, his order was due process of law, and no other tribunal, unless expressly authorized by law to do so, was at liberty to reëxamine the evidence on which he acted, or to controvert its sufficiency. 142 U. S. 600. The power to exclude aliens and the power to expel them rest upon one foundation, are derived from one source, are supported by the same reasons, and are in truth but parts of one and the same power. The power of Congress, therefore, to expel, like the power to exclude aliens, or any specified class of aliens, from the country, may be exercised entirely through executive officers; or Congress may call in the aid of the judiciary to ascertain any contested facts on which an alien's right to be in the country has been made by Congress to depend. Congress, having the right, as it may see fit, to expel aliens of a particular class, or to permit them to remain,

has undoubtedly the right to provide a system of registration and identification of the members of that class within the country, and to take all proper means to carry out the system which it provides."

An effort is made to distinguish the case before us from those cited by the circumstance that the petitioner, Lem Moon Sing, had, before the passage of the act of 1894, lawfully acquired a domicil as a merchant in the United States, and at the time of his departure from this country, for the purpose merely of visiting his native land, he was actually engaged in mercantile pursuits at San Francisco. The right of domicil, thus acquired, could not, it is earnestly insisted, be legally taken from him, nor its exercise obstructed by any action of executive officers of the government under whatever authority they proceeded; and that to give conclusive effect to the acts of such officers, when enforcing the statute of 1894, would deny to the appellant that due process of law which is required by the Constitution of the United States.

We do not understand the appellant to deny — indeed, it could not, consistently with the cases above cited, be denied — that if the appellant had attempted, after the passage of the act of 1894, for the first time, to enter the United States for the purpose of engaging in mercantile pursuits, his right to "admission into the United States under any law or treaty" could be constitutionally committed for final determination to subordinate immigration or other executive officers, with the right of appeal (if the decision be adverse to him) only to the Secretary of the Treasury, thereby excluding judicial interference so long as such officers acted within the authority conferred upon them by Congress.

The contention is that while, generally speaking, immigration officers have jurisdiction under the statute to exclude an alien who is not entitled under some statute or treaty to come into the United States; yet if the alien is entitled, of right, by some law or treaty, to enter this country, but is nevertheless excluded by such officers, the latter exceed their jurisdiction; and their illegal action, if it results in restraining the alien of his liberty, presents a judicial question for the decis-

ion of which the courts may intervene upon a writ of *habeas corpus.*

That view, if sustained, would bring into the courts every case of an alien who claimed the right to come into the United States under some law or treaty, but was prevented from doing so by the executive branch of the government. This would defeat the manifest purpose of Congress in committing to subordinate immigration officers and to the Secretary of the Treasury exclusive authority to determine whether a particular alien seeking admission into this country belongs to the *class* entitled by some law or treaty to come into the country, or to a *class* forbidden to enter the United States. Under that interpretation of the act of 1894 the provision that the decision of the appropriate immigration or customs officers should be *final,* unless reversed on appeal to the Secretary of the Treasury, would be of no practical value.

The power of Congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications. Is a statute passed in execution of that power any less applicable to an alien, who has acquired a commercial domicil within the United States, but who, having voluntarily left the country, although for a temporary purpose, claims the right under some law or treaty to reënter it? We think not. The words of the statute are broad and include " every case " of an *alien*, at least every Chinese alien, who, at the time of its passage, is out of this country, no matter for what reason, and seeks to come back. He is none the less an alien because of his having a commercial domicil in this country. While he lawfully remains here he is entitled to the benefit of the guaranties of life, liberty, and property, secured by the Constitution to all persons, of whatever race, within the jurisdiction of the United States. His personal rights when he is in this country and such of his property as is here during his absence, are as fully protected by the supreme law of the land as if he were a native or naturalized citizen of the United States. But when he has

voluntarily gone from the country, and is beyond its jurisdiction, being an alien, he cannot reënter the United States in violation of the will of the government as expressed in enactments of the law-making power. He cannot, by reason merely of his domicil in the United States for purposes of business, demand that his claim to reënter this country by virtue of some statute or treaty, shall be determined ultimately, if not in the first instance, by the courts of the United States, rather than exclusively and finally, in every instance, by executive officers charged by an act of Congress with the duty of executing the will of the political department of the government in respect of a matter wholly political in its character. He left the country subject to the exercise by Congress of every power it possessed under the Constitution.

It is supposed that the claim of the appellant is sustained by *Lau Ow Bew* v. *United States*, 144 U. S. 47. But that is a mistake. That case arose under the sixth section of the act of May 6, 1882, c. 126, 22 Stat. 58, as amended by the act of July 5, 1884, c. 220, 23 Stat. 115. It presented the question whether that section applied to Chinese merchants, already domiciled in the United States, who, having left the country for temporary purposes, *animo revertendi,* sought to reënter it and resume their business. The question was raised by writ of *habeas corpus* in the Circuit Court of the United States for the Northern District of California, which adjudged that Lau Ow Bew was not entitled to enter the United States. This court, upon *certiorari* to the United States Court of Appeals for the Ninth Circuit, reversed the judgment below, and held that the statutes there in question did not apply to Lau Ow Bew, and that he had the right to return to the United States. Now the difference between that case and the present one is that, by the statutes in force when the former was decided, the action of executive officers charged with the duty of enforcing the Chinese Exclusion Act of 1882, as amended in 1884, could be reached and controlled by the courts when necessary for the protection of rights given or secured by some statute or treaty relating to Chinese. But, by the act of 1894, the decision of the appropriate immigration or cus-

toms officers excluding an alien " from admission into the United States under any law or treaty," is made final in every case, unless, on appeal to the Secretary of the Treasury, it be reversed.

Nor is the claim of appellant supported by *In re Panzara,* 51 Fed. Rep. 275. That case was decided in 1892, and, therefore, did not involve the act of 1894. So, also, was the case of *Gee Fook Sing* v. *United States,* 7 U. S. App. 27, decided by the Circuit Court of Appeals for the Ninth Circuit.

The remedy of the appellant was by appeal to the Secretary of the Treasury from the decision of his subordinate, and not to the courts. If the act of 1894 had done nothing more than appropriate money to enforce the Chinese Exclusion Act, the courts would have been authorized to protect any right the appellant had to enter the country, if he was of the class entitled to admission under existing laws or treaties, and was improperly excluded. But when Congress went further, and declared that in every case of an alien excluded by the decision of the appropriate immigration or customs officers " from admission into the United States under any law or treaty," such decision should be final, unless reversed by the Secretary of the Treasury, the authority of the courts to review the decision of the executive officers was taken away. *United, States* v. *Rogers,* 65 Fed. Rep. 787. If the act of 1894, thus construed, takes away from the alien appellant any right given by previous laws or treaties to reënter the country, the authority of Congress to do even that cannot be questioned, although it is the duty of the courts not to construe an act of Congress as modifying or annulling a treaty made with another nation, unless its words clearly and plainly point to such a construction. *Chew Heong* v. *United States,* 112 U. S. 536, 539, 559 ; *Head Money Cases,* 112 U. S. 580, 599 ; *Whitney* v. *Robertson,* 124 U. S. 190, 195; *Chinese Exclusion Case,* 130 U. S. 581, 600. There is no room in the language of the act of 1894 to doubt that Congress intended that it should be interpreted as we have done in this case.

To avoid misapprehension, it is proper to say that the court does not now express any opinion upon the question whether,

under the facts stated in the application for the writ of *habeas corpus*, Lem Moon Sing was entitled, of right, under some law or treaty, to reënter the United States. We mean only to decide that that question has been constitutionally committed by Congress to named officers of the executive department of the government for final determination.

*The judgment of the court below denying the application for the writ of habeas corpus is affirmed.*

MR. JUSTICE BREWER dissented.